AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

FEB 2 2 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) |
| HP Chromebook computer serial number: 5CD75113QC | |

Case No.

**18 MJ 0832**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A-1

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(a)(3) | laundering of monetary instruments |
| 18 U.S.C. § 1960(a) | operation of unlicensed money transmitting business |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Nick Jones, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/22/18

_____
*Judge's signature*

City and state: San Diego, California

Jan M. Adler, U.S. Magistrate Judge
*Printed name and title*

1

2

3

Attachment A-1

## LOCATION TO BE SEARCHED

The location to be searched is a HP Chromebook computer (serial number: 5CD75113QC) belonging to Morgan Rockcoons that was detained on February 9, 2018, and is currently in the possession of the Department of Homeland Security, San Diego Cyber Crimes Group.

## ATTACHMENT B

The items to be seized include certain items, documents, and records relating to violations of 18 U.S.C. § 1956(a)(3) (laundering of monetary instruments) and 18 U.S.C. § 1960 (prohibition of unlicensed money transmitting business), including:

1. Proceeds of money laundering and operating an unlicensed money transmitting business, including: evidence of cash, bitcoin, other virtual currencies, and including passwords for access to virtual currency storage and accounts, such as digital wallets and electronic lock boxes.

2. Records relating to the operation of an unlicensed money transmitting business, including: records of the exchange of currencies for virtual currencies, records regarding customers of an unlicensed money transmitting business, advertising and materials for unlicensed money transmitting business.

3. Financial records relating to virtual currency transactions, including: bank account records, bitcoin address information, wire transfer or money transfers records, records regarding the purchase or exchange of virtual currencies, records regarding the use of pre-paid debit or credit card accounts, records or account information regarding virtual currency exchange platforms and associated services.

4. Records relating to the website Localbitcoins.com, including profile information, transactional records, and records regarding communications occurring via that platform.

5. Records of correspondence or communications conducted in the course of operating an unlicensed money transmitting business, or regarding money laundering transactions.

6. Records relating to any co-conspirators or any individuals involved in or with knowledge of the activities described herein;

7. Records tending to provide context to, or custody and control of, any responsive communications, records, and attachments described above, such as electronic mail sent or received in temporal proximity to a relevant communication or record and any communication or record tending to identify the user(s) of the electronic devices to be searched;

8. Records relating to the dominion and control of the subject premises or seized electronic device(s) and internet services at the subject premises or in the subject vehicle;

Which are evidence of violations of 18 U.S.C. § 1956 (money laundering) and 18 U.S.C. § 1960 (Prohibition of unlicensed money transmitting business). As used above, the term "records" includes all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored and any form of electronic or computer storage.

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Nick Jones, Special Agent ("SA") with the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HIS"), being duly sworn, hereby depose and state as follows:

INTRODUCTION

1.      I make this affidavit in support of applications for issuance of a search warrants, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, for:

       a.  HP Chromebook  computer (serial number: 5CD75113QC) belonging to Morgan Rockcoons (further described in Attachment A-1);

       b.  a black Google cellular telephone model Pixel 2 belonging to Morgan Rockcoons (further described in Attachment A-2); and

       c.  Seagate Backup Plus Portable Drive (serial number: NA97WEK2) belonging to Morgan Rockcoons (further described in Attachment A-3).

2.      The purpose of the search warrants is to seize items, more fully described in Attachment B, that constitute evidence and fruits of federal crimes, including: 18 U.S.C. § 1956(a)(3) (laundering of monetary instruments with the intent to conceal the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity) and 18 U.S.C. § 1960 (prohibition of unlicensed money transmitting business).

3.      The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the applications for search warrants, it does not

AFFIDAVIT IN SUPPORT OF APPLICATIONS            1
FOR SEARCH WARRANTS

set forth each and every fact that I or others have learned during the course of this investigation.

4.     I am a Special Agent employed by United States Immigration and Customs Enforcement, Homeland Security Investigations (HSI) and have been so employed since 2004.  I am currently assigned to HSI's San Diego Cyber Crimes Group.  My current responsibilities include the investigation of cybercrimes, including virtual currency money laundering and unlicensed money transmitting businesses specializing in the exchange of virtual currencies.  I have a Bachelor of Arts Degree in Political Science from the University of California, Los Angeles.  I am a graduate of the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training Program at the Federal Law Enforcement Training Center.  I have completed Network + and Global Information Assurance Certification Security Essentials Certification (GSEC) training.  Based on this training and experience, I am familiar with the manner in which persons engaged in cybercrimes operate; the manner in which cybercrimes are perpetrated; certain techniques, methods, or practices commonly used by persons engaged in cybercrime activity; and indicia of cybercrime activity.  This training and experience forms the basis for opinions I express below.

STATEMENT OF PROBABLE CAUSE

**Overview of Bitcoin**

5.     Based on my training and experience, I know that bitcoin is a digital, or "virtual," currency that exists entirely on the Internet and not in any physical form.  No government, bank, or company generates bitcoin.  Instead, computer software operating on a decentralized "peer-to-peer" network generates and controls the digital currency.  To acquire bitcoin, a user typically must purchase the currency from a bitcoin exchanger.  Bitcoin exchangers generally accept payments of conventional currency and, in return for a commission, transfer a corresponding number of bitcoin, based on a floating exchange rate, to a bitcoin address designated by the customer.  A bitcoin address is analogous to a bank account number, designated by a complex string of letters and numbers.  Further,

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

2

based on my training and experience, I know that persons operating as unlicensed money transmitters, offering bitcoin exchange services, will facilitate their activities utilizing computers, electronic tablets, and smart phones. Computers, tablets, and smart phones are vital in conducting the transfer of bitcoins from one person to another or from one address to another, because, as noted, bitcoin exists entirely on a digital network.

**Initiation of Investigation**

6.     In September 2015, I learned that San Diego-based bitcoin exchangers were advertising their services on the website Localbitcoins.com. My review of persons listing their services on this website revealed that the most prolific San Diego-based seller at the time went by the nickname "Metaballo," and advertised his services as both a trader and a seller of bitcoin. I reviewed Metaballo's Localbitcoins.com profile, discovering that it indicated that between January 2013 and September 2015, he had conducted more than 100 transactions on Localbitcoins.com and that he operated out of San Diego, Yuba City, Upper Lake, and Sacramento, California. His profile listed a website, www.kinetics.cc.

7.     Also in September 2015, I reviewed Metaballo's website and found Facebook pages for Kinetics.cc and Metaballo. The Kinetics Facebook page included a post, dated July 11, 2014, which read: "Dear bitcoin community, my name is Morgan Rockwell, I am CEO of Bitcoin Kinetics Inc. I created the first Bitcoin operated service machine to allow Bitcoin to be used in the real world in all machines and businesses. We are rapidly expanding and growing into new territories, industries into a competitive and profitable environment." Metaballo's Facebook page included posts identifying Morgan Rockwell as Morgan Rockcoons. This Facebook page also contained a post, dated January 15, 2014, stating, "Metaballo on Localbitcoins.com buy and sell bitcoins with trader Metaballo."

8.     In April 2016, I again reviewed Rockcoons's Localbitcoins.com profile, which showed that he continued to advertise as a trader and seller of bitcoin in San Diego, with his profile reflecting that he had engaged in more than 500 transactions and describing him as a professional trader. In March 2017, Rockcoons's Localbitcoins.com profile reflected that he was also offering bitcoin exchanging services in Las Vegas,

Nevada.  In October 2017, I again reviewed ROCKCOON's LocalBitcons.com profile, which showed that as of October 2017, Rockcoons's profile indicated that he conducted more than 1,000 bitcoin trades with more than 644 people.

9.   In September 2015, April 2016, and again in October 2017, I confirmed that neither Rockcoons nor any of his companies were registered as a money services business with the U.S. Department of Treasury as required under federal law.

**Undercover Investigation**

10.   In December 2016, I, acting in an undercover capacity as a person named "Nima," left a voice message with Rockcoons (at the number posted by Rockcoons on his profile on Localbitcoins.com).  I requested his service in exchanging cash to bitcoin.  In subsequent text message conversations, Rockcoons explained to me that he was aware of and followed anti-money laundering and know your customer requirements.  Rockcoons also informed me of the currency transaction reporting requirement, stating that if I engaged in a transaction in excess of $10,000 USD cash, information about me would have to be obtained.  In the course of this early exchange of text messages, Rockcoons provided me with Rockcoons's full name as "Morgan Rockwell," and further provided his legal name as "Morgan Rockcoons."   Rockcoons also provided me with his Localbitcoins.com profile as proof that Rockcoons exchanged between 30 and 60 bitcoins per week.

11.   In a text message, I informed Rockcoons in my undercover capacity that I was engaged in the manufacture of butane hash oil (a Schedule I controlled substance).  I further informed Rockcoons that the $14,500 in cash that I wanted to exchange into bitcoin were the proceeds of the manufacture of hash oil.  I informed Rockcoons that the cash was being exchanged to bitcoin to buy an extraction device, which would be used to increase my hash oil manufacturing capacity.   In text messages, Rockcoons made multiple statements to me that indicated that Rockcoons was knowledgeable about butane hash oil.  Rockcoons also told me that he operated a business engaged in the sale of marijuana and hash oil in San Francisco.  Rockcoons offered to assist me in selling the hash oil that I

manufactured. Rockcoons wrote that he wanted to be the "Steve Jobs" of "Cannabis and bitcoin," and that he had provided currency exchange services to other marijuana industry individuals and entities.

12.     Also in December 2016, in a text message, I told Rockcoons that, because I was engaged in the manufacture and sale of hash oil, I did not want to provide any identifying information in connection with my exchange of $14,500 cash for bitcoin. Rockcoons responded that he understood and suggested that I could break up the transaction over two days, each transaction being less than $10,000 USD, to avoid the currency transaction reporting requirement. Rockcoons later completely abandoned the requirement of making me break up the transaction into two separate transactions, accepting all $14,500 from me in one transaction, and not requiring any identifying information from me. Rockcoons did not file a currency transaction report.

13.     On December 30, 2016, as instructed by Rockcoons, I sent Rockcoons $14,500 cash concealed in a FedEx package for the purpose of Rockcoons exchanging it to bitcoin.   On January 3, 2017, the package was delivered to Rockcoons, which Rockcoons confirmed to me via text message.

14.     On January 8, 2017, in exchange for the $14,500 in cash that I sent to him, Rockcoons transferred 9.998 bitcoins to a bitcoin address at my direction, with an equivalent value of $9,208.62. Rockcoons charged a fee of $5,291.38 (more than thirty-six percent) for conducting the exchange.

15.     In June 2017, I introduced a second undercover persona to Rockcoons named "Chris."   At the time, Rockcoons was looking for people to invest in his marijuana distribution business in Las Vegas. On June 15, 2017, I, posing as Chris, met with Rockcoons at the Gold Spike, 217 Las Vegas Blvd North, Las Vegas, Nevada. I arrived at the Gold Spike early and sat in the lobby. I then observed Rockcoons exit an elevator within the Gold Spike. I recognized Rockcoons from his California Department of Motor Vehicles photograph.   The meeting was arranged by Rockcoons using the same phone that he used to send the texts detailed in this affidavit. In the course of the meeting,

1  Rockcoons told me that he resided at the Gold Spike and that he had signed a one-year
2  lease to live there. Rockcoons also told me that he had been very busy the prior night
3  trading bitcoins into the late hours of the night. Also during the meeting and in subsequent
4  text messages, Rockcoons described his involvement in the exchanging of bitcoin as well
5  as his marijuana and marijuana concentrates activities. Rockcoons described his bitcoin
6  activities in a text message to me as, "I'm a professional money manager and mover of
7  funds without personal identification information attached to the funds or equity. This is
8  my speciality [sic]."

9  **Interview of Rockcoons**

10       16.    Based on my ongoing undercover communications with Rockcoons, I knew
11  that Rockcoons planned to be at the Coffee Bean and Tea Leaf on West Broadway in San
12  Diego on August 30, 2017. Another HSI special agent and I approached Rockcoons at the
13  café, identified ourselves, and asked Rockcoons if he was willing to speak with us about
14  Rockcoons's bitcoin business. Rockcoons agreed.

15       17.    Rockcoons admitted that for the past nine years, his sole source of income has
16  been from fees charged for the buying and selling of bitcoin for different customers. He
17  estimated that he had conducted transactions with third parties totaling 10,000 bitcoin (as
18  of August 1, 2017, one bitcoin traded for $4,738). Rockcoons explained that he advertises
19  his bitcoin exchange business on Localbitcoins.com. He said that he meets people on this
20  website and then meets them in person to conduct the exchange. Rockcoons admitted that
21  he conducted thousands of bitcoin transactions with customers he met on
22  Localbitcoins.com. Rockcoons said that he charges his customers between 10 to 20
23  percent commission and that he conducts about 5 to 10 transactions per day.

24       18.    Rockcoons acknowledged that his business constitutes a money services
25  business. He also admitted that when he conducts an exchange in which he receives more
26  than $10,000, he is required to fill out a currency transaction report (CTR). Rockcoons
27  said that he has never filed a CTR. He also said that he never asked for a customer's
28  identity, even though he knew that he should, because he did not want to risk losing

1  customers.  He admitted that he should have had an anti-money laundering program and
2  that he should have followed know your customer practices but did not.  Rockcoons told
3  me that he had various business records regarding his operation of his unlicensed money
4  transmitting business at his residence in Las Vegas.

5  **Indictment**

6       19.    On or about November 8, 2017, a federal grand jury sitting in San Diego,
7  California, returned a sealed two-count indictment against Rockcoons (docket no. 17-cr-
8  3690-AJB), charging him with (i) laundering of monetary instruments, in violation of 18
9  U.S.C. § 1956(a)(3); and (ii) operation of unlicensed money transmitting business, in
10  violation of 18 U.S.C. § 1960(a).  Pursuant to 18 U.S.C. § 982, the indictment also includes
11  forfeiture allegations, seeking the forfeiture of any property involved in the charged
12  offenses, property traceable to such property, or property up to the value of property
13  subject to forfeiture.

14  **Arrest of Rockcoons and Detention of Laptop, Cell Phone, and Portable Drive**

15       20.    On February 9, 2018, law enforcement arrested Rockcoons at the Palms Hotel
16  in Las Vegas, Nevada, where he was staying.  In the course of entering the hotel room and
17  making the arrest, law enforcement observed and etained a HP Chromebook (serial
18  number: 5CD75113QC), a black Google cellular telephone model Pixel 2, and a Seagate
19  Backup Plus Portable Drive (serial number: NA97WEK2).  The laptop computer, cellular
20  telephone, and portable drive were shipped via parcel service to me in San Diego,
21  California, where I received them on February 20, 2018.

22  **Training and Experience Regarding Transactional Records and Computer**
23  **Evidence**

24       21.    In my experience and training, individuals involved in operating unlicensed
25  money transmitting businesses maintain transactional records on electronic media, such
26  as laptop computers, desktop computers, electronic tablets, mobile phones, and portable
27  drives for long periods of time.  Based on the investigation to date, the unlicensed money
28

1   transmitting and money laundering activities, as outlined above, were facilitated by
2   utilizing a computer and/or other electronic devices, including telephones.

3       22.    With today's advanced technology, which includes cloud-based computing,
4   large storage devices, and automated backup systems, electronic evidence can persist for
5   long periods of time with or without the user's knowledge.  The nature of some storage
6   devices, such as hard disk drives, allows recovery of data that have been deleted by the
7   user.  As storage devices increase in size, the chances of successful recovery also tends to
8   increase, because the odds that deleted data being overwritten by fresh data diminishes.

9       23.    Computer evidence can also persist if a user switches to a different computing
10  device.  One example is the use of a service provided by Apple called "iCloud," which
11  syncs data across multiple user devices.  With this technology, a file created or modified
12  on one particular device will be synchronized to appear on all the user's devices.  Many
13  users employ iCloud or similar services to move data from an old device to a new device
14  (sometimes called data "migration").

15      24.    Based on my communications with Rockcoons, I know that he is very
16  knowledgeable about computers, even authoring computer code. Sophisticated computer
17  users often maintain computer backups called "images" of their computer(s) and device(s)
18  in an effort to preserve data and quickly replicate time-consuming settings and
19  configurations in the event of a system crash, loss of device, or migration to a new
20  device.  The use of these images mean that evidence on a particular individual's
21  computer(s) or device(s) can persist over time as they are moved from device to device.
22  In my opinion, Rockcoons, would be likely to employ such a methodology.

23      PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

24      25.    With the approval of the Court in signing these warrants, agents executing
25  these search warrants will employ the following procedures regarding computers and other
26  electronic storage devices, including electronic storage media, that may contain data
27  subject to seizure pursuant to the warrants:

28

1

## Forensic Imaging

2          a.      A forensic image is an exact physical copy of the hard drive or other
3 media. A forensic image captures all the data on the hard drive or other media without the
4 data being viewed and without changing the data.  Absent unusual circumstances, it is
5 essential that a forensic image be obtained prior to conducting any search of the data for
6 information subject to seizure pursuant to these warrants.

7          b.      After verified images have been obtained, the owner of the devices will
8 be notified and the original devices returned within forty-five (45) days of seizure absent
9 further application to this court.

10                ## Identification and Extraction of Relevant Data

11         c.      After obtaining a forensic image, the data will be analyzed to identify
12 and extract data subject to seizure pursuant to the warrants. Analysis of the data following
13 the creation of the forensic image can be a highly technical process requiring specific
14 expertise, equipment and software. There are thousands of different hardware items and
15 software programs, and different versions of the same programs, that can be commercially
16 purchased, installed, and custom-configured on a user's computer system.  Computers are
17 easily customized by their users.  Even apparently identical computers in an office or home
18 environment can be different with respect to configuration, including permissions and
19 access rights, passwords, data storage, and security.  It is not unusual for a computer
20 forensic examiner to have to obtain specialized hardware or software, and train with it, in
21 order to view and analyze imaged data.

22         d.      Analyzing the contents of a computer or other electronic storage device,
23 even without significant technical challenges, can be very challenging.  Searching by
24 keywords, for example, often yields many thousands of hits, each of which must be
25 reviewed in its context by the examiner to determine whether the data is within the scope
26 of the warrants. Merely finding a relevant hit does not end the review process for several
27 reasons.  The computer may have stored metadata and other information about a relevant
28 electronic record – e.g., who created it, when and how it was created or downloaded or

copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted.  Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used.  For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text format.  Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image.  Graphic images, unlike text, are not subject to keyword searches.  Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum.  To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e.    It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data.  Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files

1  or documents, may serve to identify a particular user. For example, if an incriminating
2  document is found on the computer but attribution is an issue, other documents or files
3  created around that same time may provide circumstantial evidence of the identity of the
4  user that created the incriminating document.

5         f.    Analyzing data has become increasingly time-consuming as the volume
6  of data stored on a typical computer system and available storage devices has become
7  mind-boggling. For example, a single megabyte of storage space is roughly equivalent of
8  500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes,
9  is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are
10  now being sold for personal computers capable of storing up to 2 terabytes (2,000
11  gigabytes) of data. And, this data may be stored in a variety of formats or encrypted
12  (several new commercially available operating systems provide for automatic encryption
13  of data upon shutdown of the computer). The sheer volume of data also has extended the
14  time that it takes to analyze data. Running keyword searches takes longer and results in
15  more hits that must be individually examined for relevance. Once reviewed, relevant data
16  leads to new keywords and new avenues for identifying data subject to seizure pursuant to
17  the warrant.

18         g.    Based on the foregoing, identifying and extracting data subject to
19  seizure pursuant to the warrants may require a range of data analysis techniques, including
20  hashing tools to identify data subject to seizure pursuant to the warrants, and to exclude
21  certain data from analysis, such as known operating system and application files. The
22  identification and extraction process, accordingly, may take weeks or months. The
23  personnel conducting the identification and extraction of data will complete the analysis
24  within one-hundred twenty (120) days of the warrants, absent further application to this
25  court.

26         h.    All forensic analysis of the imaged data will employ search protocols
27  directed exclusively to the identification and extraction of data within the scope of this
28  warrant.

AFFIDAVIT IN SUPPORT OF APPLICATION     11
FOR SEARCH WARRANTS

<u>Procedures For Electronically Stored Information on Cellular Phone</u>

    i.  It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

    j.  Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

    k.  Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting

1   the identification and extraction of data will complete the analysis within ninety (90) days
2   of the date the warrant is signed, absent further application to this court.

3                    <u>GENUINE RISKS OF DESTRUCTION OF EVIDENCE</u>

4          26.    Based upon my experience and training, and the experience and training of
5   other agents with whom I have communicated, electronically stored data can be
6   permanently deleted or modified by users possessing basic computer skills.  In this case,
7   Rockcoons is believed to have more than basic computer skills.  If Rockcoons received
8   advance warning of the execution of the warrants, there is likely to be a genuine risk of
9   destruction of evidence.

10                    <u>PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE</u>

11         27.    Other than as described above, the United States has not attempted to obtain
12  this data by other means.

13                                      <u>CONCLUSION</u>

14         28.    Based on the foregoing, there is probable cause to believe that the items
15  identified in Attachment B are evidence of a crime, contraband, fruits of a crime or other
16  items illegally possessed, or were designed for use, intended for use, or used in committing
17  a crime in violation of 18 U.S.C. § 1956(a)(3) (laundering of monetary instruments with
18  the intent to conceal the nature, location, source, ownership, or control of property
19  believed to be the proceeds of specified unlawful activity) and 18 U.S.C. § 1960
20  (prohibition of unlicensed money transmitting business) and will be found in the locations
21  to be searched as provided in Attachments A-1. A-2, and A-3.

22
23                                          NICK JONES
                                            Special Agent,
24                                          Homeland Security Investigations
25
    Subscribed and sworn to before me this 22nd day of February, 2018.
26
27
                                            Hon. JAN M. ADLER
28                                          United States Magistrate Judge

AFFIDAVIT IN SUPPORT OF APPLICATION              13
FOR SEARCH WARRANTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Attachment A-1

<u>LOCATION TO BE SEARCHED</u>

The location to be searched is a HP Chromebook computer (serial number: 5CD75113QC) belonging to Morgan Rockcoons that was detained on February 9, 2018, and is currently in the possession of the Department of Homeland Security, San Diego Cyber Crimes Group.

Attachment A-2

## LOCATION TO BE SEARCHED

The location to be searched is a black Google cellular telephone model Pixel 2 belonging to Morgan Rockcoons that was detained on February 9, 2018, and is currently in the possession of the Department of Homeland Security, San Diego Cyber Crimes Group.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

Attachment A-3

2

LOCATION TO BE SEARCHED

3

4       The location to be searched is a Seagate Backup Plus Portable Drive (serial

5   number: NA97WEK2) belonging to Morgan Rockcoons that was detained on February 9,

6   2018, and is currently in the possession of the Department of Homeland Security, San

7   Diego Cyber Crimes Group.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT B

The items to be seized include certain items, documents, and records relating to violations of 18 U.S.C. § 1956(a)(3) (laundering of monetary instruments) and 18 U.S.C. § 1960 (prohibition of unlicensed money transmitting business), including:

1. Proceeds of money laundering and operating an unlicensed money transmitting business, including: evidence of cash, bitcoin, other virtual currencies, and including passwords for access to virtual currency storage and accounts, such as digital wallets and electronic lock boxes.

2. Records relating to the operation of an unlicensed money transmitting business, including: records of the exchange of currencies for virtual currencies, records regarding customers of an unlicensed money transmitting business, advertising and materials for unlicensed money transmitting business.

3. Financial records relating to virtual currency transactions, including: bank account records, bitcoin address information, wire transfer or money transfers records, records regarding the purchase or exchange of virtual currencies,  records regarding the use of pre-paid debit or credit card accounts, records or account information regarding virtual currency exchange platforms and associated services.

4. Records relating to the website Localbitcoins.com, including profile information, transactional records, and records regarding communications occurring via that platform.

5. Records of correspondence or communications conducted in the course of operating an unlicensed money transmitting business, or regarding money laundering transactions.

6. Records relating to any co-conspirators or any individuals involved in or with knowledge of the activities described herein;

7. Records tending to provide context to, or custody and control of, any responsive communications, records, and attachments described above, such as electronic mail sent or received in temporal proximity to a relevant communication or record and any communication or record tending to identify the user(s) of the electronic devices to be searched;

8. Records relating to the dominion and control of the subject premises or seized electronic device(s) and internet services at the subject premises or in the subject vehicle;

Which are evidence of violations of 18 U.S.C. § 1956 (money laundering) and 18 U.S.C. § 1960 (Prohibition of unlicensed money transmitting business). As used above, the term "records" includes all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored and any form of electronic or computer storage.